Good morning, Your Honors. Marcia Van Landingham, Appeal on behalf of Appellant Donna K. Lee. Had Donna Lee been allowed to stand trial separately from the man who was the true aggressor in this case and to present the key exculpatory evidence, she would have established to the satisfaction of at least some of the jurors that she wasn't a participant in a double homicide, but that instead she was the intended victim of what would have been a triple homicide. The evidence would have supported a defense that Paul Karasie gathered together the three women who were causing him difficulty in his life with the intent to kill them all at once. Donna Lee was lucky to survive the stab wounds inflicted by the perpetrator, including one that resulted in a partial evisceration. Her luck ended, however, when the trial court forced her, a long-battered woman, to be tried at the side of her attacker. Because the trials were joined, the court excluded much of the evidence that would have established Karasie's motive to kill Ms. Lee, that would have undermined the State's allegation of a conspiracy to kill, and that would have rehabilitated Ms. Lee's credibility with the jury. And what prevented her from doing all of this and presenting that kind of a defense in a joint trial? There was a lot of evidence that was explicitly excluded on the court's finding that it would have been overly prejudicial without having sufficient probative value. 352? Correct. This evidence included... Well, that doesn't necessarily mean it would have come in in a separate trial. That is correct, but the defense theory as a whole would have been presented in all of its facets in a way that it couldn't have been in this joint trial, because the defendant was sitting right there. Well, in that situation, then, Lee, that's what I'm worried about, Lee would have been accusing the co-defendant of murder. Exactly. In this case, Lee did not accuse her co-defendant of anything. She claimed that she and he were both victims of independent robberies. She did not do so directly. She did not do so, period. She said she could not see, or she did not have any memory of seeing the face of her attacker. Trial counsel effectively attempted to present a defense in which all the circumstances pointed directly to Paul Karasie as the murderer. Trial counsel, for example, pounded on the point that there was one knife and that it had the blood of all three women on them, that only Paul Karasie had motive to kill all three women, while even the trial judge acknowledged on the record that there was, after the prosecution's case in chief, that no evidence had been presented of any motive on the part of Ms. Lee. And the trial counsel also, during closing, effectively said this was not a case of any sort of robbery. This was a rage killing, clearly. The defense that was asserted by Lee was a non-adverse defense to her co-defendant. Effectively, it was. Why do you say effectively? I mean, it was. The reason I say that is because trial counsel could not say directly that Paul Karasie was the murderer, the attacker of Ms. Lee. Nobody accused the other of doing anything wrong. Yeah, why not? Why couldn't he have made that argument? The reason why is exactly contained in the evidence that was excluded, in the evidence of her being a battered woman, in the evidence of this relationship that they had had, which led him to want to kill her. From the very, very beginning, she told the police, if she thought he had attempted to murder her, why wouldn't she have told the police that from the very beginning? Yeah, trial counsel brought on a witness, Dr. Vianne Castellano, in order to explain all of this. Basically, what Vianne Castellano would have said, and what was told to the court in an offer of proof presented by trial counsel, was that Ms. Lee had been battered from her childhood. Well, that all came in in the penalty phase. That came in at penalty phase, correct, and resulted in a non-death verdict, or at least a hung jury. It did not come in at the guilt phase because of the exclusion ruling, but it would have presented to the jury an image of a woman who had been beaten, sometimes on a daily basis throughout most of her life, by her father, by her three husbands, who had found a man who did not beat her, but had other types of, perhaps, abusive practices with her. But still, he did beat her, finally, in an altercation. So why was this battered women's syndrome evidence offered? For what purpose was it identified? To support the, there were a couple of reasons. One of them was to support Dr. Castellano's evidence. She was allowed to come on the stand and say that after the trauma of her own attack, after her liver was lacerated by this knife, you know, during this fight, that she did not remember her attacker, and that afterwards she had gaps in her memory. So that was corroborated by the doctor's testimony. The doctor gave that testimony, and the battered women's syndrome, what that would have done, would have been explained to the jury why one attack could lead to such serious, such severe... Well, California tells us that the battered women's syndrome defense applies only in certain limited circumstances, and those circumstances were not present in this case. That's a question of state law. Your Honor, the state law... We're supposed to tell California you don't understand your own battered women's syndrome evidence rules? Actually, I am saying that, but that's in part because the case law was misunderstood, because there is case law that does say that one of the instances in which battered women's syndrome evidence can be presented is to support the credibility of the defendant, and that is exactly what it was being offered for here. And actually, the trial counsel said that in offers approved to the court. And in this case... But you concede that the witness did testify about the witness's credibility. Excuse me? You concede that that witness did testify with respect to the witness's credibility as to why she might not have remembered what this was all about. But that... Yes, Your Honor, but that testimony was severely constrained. The judge limited Dr. Deanne Castellano's testimony to only what happened at the time of the murder and thereafter. The preceding testimony, the battered women's syndrome testimony directly, would have explained, would have given the jury the basis for an understanding of how it was just not one traumatic incident, but it was one final severe traumatic incident at the end of a lifetime of continued abuse, of continued traumatic incidents. And it would also... So that would have supported that testimony, but it also would have supported Ms. Lee's own... The prosecution continually presented her as somebody who couldn't remember key things, who changed the story... But she did say she couldn't remember who attacked her. Right. So maybe your witness would have verified her inability to identify her attacker. But she never accused the co-defendant of attacking her. Right. So what difference... Whether she can't remember the stranger who attacked her, that doesn't seem to be very important. But she got her memory buttressed, you might say, by that witness. But isn't there a burden of proof on the defendants in a lawsuit to get severance? Doesn't the law generally, if you do the crime together, you will be tried together unless for due process reasons and at the request and at the proof of the defendants, it must be severed so that they can have their due process trial. Right. Isn't that the general rule? Yes. Well, there was no request. There was no evidence of a defense that was adverse to raise that problem because neither one of them would accuse the other anything wrong. Right. That's sort of two questions, but they have a similar answer. I mean, if the jury looks at a woman sitting next to a man, and the woman has long been battered, and he's sitting right there, and somebody like me in such a situation might not feel any compunction to point fingers. Somebody like her who has had no hope through her life, who has had no recourse, has had no way out, has never been shown by the system that she can be protected. But she never indicated at trial that she wanted that there was any basis. She never indicated to the trial court that there was any basis for making that argument. At once, at any time she told the trial court she wanted to say that, you know, I was traumatized throughout my life, and that's why I couldn't part ways from Karassi or that I went along with his story or whatever. But how could the trial court read her mind to know that she was withholding her defense without putting something before it? Maybe I'm misunderstanding the question. Well, didn't she have the option to plead not guilty by reason of duress? Yeah, I contributed. I was helping him kill these two people, but only because I was a battered woman. And I was under duress. I was fearful of him. He was battering me and would be battering me, so I want to be forgiven for the reason why I did it. But in this case, she didn't say she did it. She said she didn't do it. So there goes the reason for letting it in. It seems to me it takes it out. The trial counsel did tell the court in a sidebar that he wished he could say that Ms. Lee had seen the face of the attack. That she what? Mr. Karasi. The trial counsel said he wished he could say that Ms. Lee had seen her attacker's face, and it was Mr. Karasi. But he couldn't because she didn't testify that. She hadn't seen. She couldn't remember the face. So then what trial counsel wanted to do and was foreclosed from doing was present the reasons why somebody like her in her situation either would not remember or would not be able to bring herself to admit to the memory. Well, the way the Court of Appeal saw this, they said, quote, both defendants blamed unknown assailants for the murders. Is that right? Yes, however. And they both claimed to have been themselves victims of the unknown assailants. That seems to me to be a fair characterization of what went on. The prosecutor himself, during closing argument, admitted, and it's one of the quotes on the record, that the two defenses. You know, admissions and closing arguments is in evidence, among other things. But the Court of Appeal says, hey, look, they blamed other people, and they said we were the victims of these other people. That seems to me to be a fair characterization of the way this trial went down. You're right. It's not evidence. But it does show that within the trial itself, it was an understanding of how things were proceeding when the prosecutor says the two defenses here are diametrically opposed. And those are the words he used, diametrically opposed. And the trial counsel, Ms. Lee's counsel, many times referred to Ms. Lee as the third victim. And the fact that she never said that she for sure saw the attacker's face as called Karassi doesn't mean that it wasn't. And of course, considering there was only one knife found with the blood of all three women, et cetera, the circumstances were quite clear. And the other evidence that was not allowed in would have explained what was going on there, I think. In terms of Ms. Lee's own testimony. So I would like, if possible, to touch on the procedural default issue. Yes. Why don't you talk about that? Because I have concern about whether Dixon was an independent and adequate procedural ground at the time. There are two aspects to this issue that I think are key here. The first is that, well, I think what this really boils down to is there's a fundamental unfairness in the fact that the court below has ruled that a number of Ms. Lee's claims are barred from consideration because of this Dixon rule. But this rule has never been found by this court as adequate to bar Federal review. So what that means What were those claims, the five claims that she found procedurally barred? There are actually 11 claims. Claims five through 11 that were? Plus four more. Okay. Yes. And they range from conflict of interest in the fact that Ms. Lee's initial counsel was hired by Mr. Karasi and was controlled by Mr. Karasi through the preliminary hearing clearly was presenting Mr. Karasi's case rather than her. There's a Batson claim in there. There are juror misconduct issues. And all of these are being barred from consideration, again, under this rule that is not adequate, has never been adequate, and has never been ruled to be adequate when the substance of it has been looked at. What the problem is, is that this Court's holding in Bennett v. Mueller about the shifting of the burden of proof is being applied at times in courts below to put an open petitioner who is often working pro se and trying to do research out of prison libraries and working under very short time circumstances. And in those circumstances, this pro se petitioner is being required to put together a very complicated argument when even under counsel's help, we often don't have access to a lot of the cases that the State has to prove how inconsistently Dixon is always applied. Here, what we did is in an appendix, a couple of appendices to the opening brief, we included, you know, just a small segment of element of proof of the inconsistency of Dixon, of its application. We would like to have this case remanded back to district court and help petitioner to meet the burden of proof, which... Well, her burden is pretty small because, I mean, it's very, very minimal with this particular, with Dixon because nobody's ever expressed the world that Dixon is adequate. So she's a very small burden of proof. It's really going to be, the government's going to have to, the warden's going to have to demonstrate that if we remand it, that it is an adequate State ground. I would like it to be a small burden of proof, and I would love it if this court would clarify that it's a small burden of proof. But what Bennett v. Mueller actually says is that once the State pleads the procedural default defense, that the petitioner, the burden then falls on the petitioner to assert specific factual allegations that demonstrate the inadequacy of the State procedure. Right. You just had to cite two cases where it wasn't applied the same way. I mean, I wrote that, so I know. I mean, it's basically, I mean, she has to show, she has to put in a few cases that show that Dixon hasn't been applied in the same way and to mean the same thing. So two cases would be sufficient. Well, I would, I mean, if they're not, I would put more if I had them. But I'm just saying that what their position is is that it's being consistently applied, and no one's ever held that. And so, you know, and the State's never been put to proof of that. I mean, I'm sure that you could easily find cases where it's been not consistently applied. There are courts below that are interpreting that ruling much more stringently, that are requiring a whole lot more from the petitioner, and that, therefore, they can't be met. And so once the courts below find that the petitioner has not met it, then the procedural default is applied to them, even though, again, it is giving much more consistency. Are you saying generally or with respect to Dixon? With respect to Dixon, I was actually going to say that with respect to untimeliness, the holding in King v. Lamarck is much more open. It says basically that any challenge made by the petitioner to that is sufficient. And it appears to me that something like that in something like Dixon would be very useful, again, considering how many petitioners are working under such difficult, difficult circumstances. And, you know, for example, in this case, Ms. Lee's own response, you know. She was pro se below. She was pro se, and basically her response was a plea for understanding and saying, I'm pro se, I don't know what's going on here, help. And, of course, then the district court below found that to be inadequate and, therefore, applied this procedural default against her, even though it is not constitutionally an adequate procedural bar. I think, now, which procedural bar is the Supreme Court considering right now? They did grant cert on that. Timeliness. The timeliness bar. Okay. But not Dixon? No. Okay. All right. Thank you, counsel. Thank you. Good morning, Your Honors. May it please the Court, I'm Bob Snyder, Deputy Attorney General for Warden Jacques. Is there a particular place the Court would like me to start? You've talked about procedural default and errors. Okay. Well, you know, I'm concerned about how the – I mean, there was a lot of testimony in the penalty phase about battered woman syndrome. And although it wouldn't come in as a defense in this case, the California courts have felt that it could come in to bolster credibility. And I have a concern that, you know, someone says, well, I don't remember, you know, what happened immediately, notwithstanding the fact they had driven their car all the way over somewhere else and they were found close by, a lot of evidence. But she's saying she doesn't remember, and it seems to me that the evidence of syndrome would support her going into a dissociative state and not remembering such a traumatic incident if that happened. So would you address that, whether – I mean, why that wasn't prejudicial to exclude that evidence? I will, Your Honor. I think we have to be careful not to read too much into the California court that credibility also weighs into battered woman syndrome evidence. Because every single case in which credibility was considered involved the battered woman syndrome defense. But specifically the memory loss. I mean, I've been around people who were, you know, battered women, and there is a disassociation that is there when they're threatened or – I mean, they experience the violence. They retreat into themselves, become very cold and nonreactive. And so, I mean, I know that that is a real thing. And so as to the memory loss, I would think the jury would be – I am very skeptical about six-hour memory loss after this incident. But, you know, I would think the jury might be swayed by hearing this other state after having trauma inflicted on her. Your Honor, I would answer in two ways. And I think the court is correct that I can't tell you that that would be entirely irrelevant. But the jury actually did hear quite a bit of battered woman syndrome theory, if not expert evidence. And, you know, we talked about the relevance of counsel's argument. But it did come in an opening and closing statements that a petitioner was a victim of physical abuse throughout her entire life. And a letter came in to her co-defendant that, my past is too painful, there's so much you don't know. And counsel concluded his argument, that his petitioner's counsel, by saying that she'd been involved in these domestic violence issues forever. So it didn't come in through Dr. Castellano. But I would submit that because the theories had come in of dissociative amnesia, that that was adequate to alert the jury to possible memory problems. I think the point would be better taken if the testimony had been, one of my batterers was responsible for the knifing. And that's why I went into dissociative amnesia. One of my batterers was responsible for the what? For the knifing. For the murders of the other two? No, for stabbing the petitioner herself. Had she been willing to testify that her co-defendant was her assailant, I think we'd not only have admissible battered women syndrome evidence, but we'd probably have had a severance. And it's kind of interesting that throughout the trial, the severance decision was a work in progress. The court said on several junctures, I don't know what the defense is. But right now, based on what you're telling me, this doesn't warrant a severance. The court had been open to it. The other point with respect to severance, and it's not the whole ballgame, but I think we do have to consider the efficacy or the expediency of whether to sever a trial this large. You know, there were 64 witnesses, counting seven for the defense. 1,700 photographs and evidence. 17 tape recordings. 253 exhibits for the state, most of them admitted. 60 defense exhibits. The two forensic experts alone took 10 court days. And just try the guilt phase for the two defendants took more than four months. So your argument is the reasons for joinder are well served by this case? Thank you, Your Honor. That's better put. And as I say, it's the – but, you know, most centrally, our jurisprudence tells us that even if the defenses are antagonistic and prejudicial, severance isn't required. That's Zaffiro, the Supreme Court's case in 1993. And most recently in this court, just earlier this year, Collins v. Reynolds said that there's no clearly established federal law requiring severance even if the defenses are mutually antagonistic. Well, is there any jurisprudence that says that severance can be required when there is no adversity? No, not at all, Your Honor. Well, it can if there is – if another specific trial right would be violated, but I don't see any other specific trial right that she's put forth. I think that's the case, Your Honor. And, of course, the overlay to all this is what was the strengths of the state's case. Was there, for habeas purposes, a substantial and injurious effect? And if we looked at the evidence just briefly, there was so much. And, you know, by the way, when the prosecutor suggested that the defendants were diametrically opposed, I don't think it was in the context of saying that their facts differed. I think what the prosecutor was trying to argue is that they're both lying to you, that the inconsistency reflects that neither one is telling the truth. But the petitioner had a tough situation because evidence for pre-offense statement came in that she was going to do something stupid and have to go to prison for it. There was evidence that she and the co-defendant were going to meet at the ambush site. The evidence found in the petitioner when she was apprehended was just overpowering, not just for its intrinsic value, but for the fact that she couldn't explain it. The bloody knife, the victim's checkbook, the other victim's purse, and blood-stained gloves. Did that knife have DNA evidence of all three women on the knife? You know, my recollection, Your Honor, is that the ex-wife's blood was on the knife. But I don't recall that it was conclusive as to the other parties. I think the testimony was that it was. I thought counsel mentioned, maybe I misunderstood her, but I thought she mentioned something about all three victims' blood were on the knife. I heard that, too, but I don't think that's quite what the record reflects. I think it was confirmed as to the ex-wife and consistent with the other two women. Consistent with them. Yes. In other words, not a conclusive DNA match. So I think that's a little different from saying that all three, the blood of all three was on the knife. That would be an example of consistent, but not a match. Like, for example, would they say, we found two other human blood samples, but we couldn't say what the DNA was of that? There are characteristics of the blood that are consistent with these two individuals' DNA, but we can't say conclusively that it's their DNA. But they weren't her DNA. Correct. Correct. But one of the victims was there. By her, do you mean Petitioner's? No, the first wife. Her blood was on the knife. Her blood was confirmed. Her DNA was on the knife. Correct. But her mother's not proved, and her own blood not proved. Not proved beyond a statement that it's consistent, in the same way that we say sometimes that fingerprint evidence is consistent. But there was DNA testing? Quite extensive, Your Honor. Not just on the knife, but on Petitioner's jeans, which revealed the co-defendant's mother's blood. And on the three gloves recovered at the scene, DNA. Again, not conclusive, but consistent with all three women. You've got a procedural bar issue here, claims 4 through 11, plus some others. What can you tell us about that issue? Well, candidly, Your Honor, not a whole lot more than I put in my brief with respect to the applicability of the bar. But while we're talking about it, two related points occur to me. Number one, the issue that's come up from the district court was only juror misconduct. Petitioner chose to appeal only that issue as defaulted. And I would submit that there's been a waiver in this court as to the other procedural defaulted issues. Was this her? Did she file that pro se, or did she have counsel at that point? It was pro se, Your Honor. But, you see, at this point in the district court, where in this court where counsel's been appointed, I would submit that it would be incumbent upon counsel now to say, we want not only a juror misconduct issue considered, but we want the other defaulted issues considered, too. I think she said that. She said 11. Well, she corrected me and said 11. I thought she was asking for claims 5 through 11. Yeah, I think so, because the other four have been dealt with separately. But, you know, to put it bluntly, that's an issue that should have been briefed. You know, all we've been talking about here is juror misconduct. The second point I'd like to make with respect to the Dixon bar is the material that was submitted with the appeal concerning whether or not Dixon applies is interesting, but the district court didn't have the benefit of considering that. And I considered even moving to strike that, but it seemed like bad sportsmanship. But the problem is for the Ninth Circuit to take that anew really disagrees. Well, shouldn't we send it back and ask the district court to take another look at it? With respect to the juror misconduct issue, I think the court could do that. With respect to the other issues, I really think not. I don't understand. I mean, what are the other issues that you're talking about? Well, counsel mentioned several. There was also an issue of provocation in the jury instructions. And there was also the issue of there was no female jurors. Batson? I do recall that, yes. And that seems pretty problematic. Well, you know, it could be. It could be. We don't know. You're right. We don't know. My point really is that counsel had the opportunity when this appeal was filed and when the merits were reopened by this court to raise all those issues. And so I think there's something kind of procedurally. I'm just looking to see. I can't quite think of the adjective, but it just doesn't seem right. Well, you're arguing waivers. But she waived that claim as to everything other than prosecutorial misconduct. I was looking for the W word. Thank you, Your Honor. With respect to juror misconduct, I think on the merits, there's really not a problem from the State's perspective. Because although appellant's caption says the juror was sleeping, the evidence is quite different. There's no evidence that the juror was sleeping. She had her head back. She was resting against the wall. She explained to the court in a hearing that no one has quarrel with that she was having esophageal spasms. And she said she didn't miss a word. The trial court accepted that finding. So did the court. There's no showing she was missing from any of the testimony when she left. That's correct, Your Honor. And so although the standard review here is de novo, as to the factual finding under 2250.41, it's presumed correct in the absence of clear investigative evidence. To the contrary, that has to be presented. Okay. Counsel, let me just ask you this question, though, because I'm concerned a little bit about the waiver argument. The blue brief at page 19 does say the district court found claims 5 through 11 in Lee's second amendment petition for writ of habeas corpus and claims 1 through 4 in her supplement to be procedurally barred. But this was an improper determination. Why didn't she raise it sufficiently? Because I think this Court's jurisprudence says that arguments raised in a one-sentence statement are really not adequate. And if the Court wishes, I'd be happy to brief this issue of whether there's been a waiver as to the other procedures. But she goes on to argue it. I mean, she goes on from page 19 to 20 to 21. She says she argues each one of the cases, Waltrius, Seaton, Dixon. I mean, it seems like she's making a full argument. Well, I think so, Your Honor, but it seems to be only with respect to the juror misconduct issue. And I'm a little at a disadvantage because since ECF, I don't get a blue copy. But I just have a printout. Okay. I recall the brief, and I think what's missing here is the district court wrongly dismissed all those other issues. And it, as I say ---- I think you should have put more description of each of the issues. Well, I think any district court. Instead of just looking them all together. The one counsel tactically chose to raise was juror misconduct. To come in now and say, oh, plus there's six others. I didn't brief them, but I think you should look at them. It just seems unfair. But I could give the Court a more articulate approach if the Court did wish supplemental briefing just on the waiver issue. Well, we'll talk about that. And if we need supplemental briefing, we'll ask you. But I don't know. It seems to put in a lot of evidence here. Anyway. But we'll have to consider that. And if we need supplemental briefing. Fairly right. Do you want to address anything else? Just to cover one other point, if I may, by counsel. The counsel suggested that her ---- the trial attorney, trial counsel tried to enter into a piracy and that there was an evidence of motive with respect to Petitioner. There was actually evidence of motive because she had had the physical fight with Petitioner ---- with the co-defendant's mother, you know, shortly before they came to blows. And that did, in fact, provide a motive for Lee's actions with respect to, at least, the mother. So thank you very much for your time. Thank you. I'll give you a couple minutes, even though you were over. Just briefly to the briefing issue. The waiver issue. The waiver issue. Correct. The district court barred the majority of Ms. Lee's claims as procedurally defaulted. And the choice was made in the appeal. The choice was made with no subject, meaning you made the choice. Actually, no. It wasn't me. It was my predecessor on this case. Okay. But only address germist conduct on page 54. Right. Well, basically, the alternative would have been to present an appeal not just on the procedural default itself, but then subsequently on the merits of 11 other issues. But you put in germist conduct. Right. As more of a ---- And left out all the others. Yeah. Rather than having, you know, a much longer brief. But we would be very, very happy to go back and brief the other issues as well. It was just a choice made not to brief every issue. Choices amount to waivers. Well, since the COA was on procedural default, that's what we concentrated on. But, of course, we can't argue that these claims were not procedurally defaulted without intending to preserve the actual issues themselves more than just the one. So you believe less Judge Light messed up on the germist conduct issue, on whether the juror was sleeping? I am not certain that is the issue I would have presented if that had been my case at that time. Not to ---- I probably shouldn't say that. But I would very much like the opportunity to brief the issues as a whole, especially the Batson and the conflict of interest and some of these other claims. And, you know, I would prefer that they not be barred on, again, a procedural default rule that I don't think is constitutionally valid. Who's your district court judge in this case? It was ---- Oh, I am completely blanking on this. Never mind. Procedures. Yes. Thank you. Judge Light was the state court judge. Correct. And the magistrate judge was Paul Abrams. All right. Well, if there's nothing further, thank you, counsel. Thank you. And this session of the court will be adjourned for today. Thank you very much. All rise. The court is adjourned. Oh, can you hit me? Okay. Thank you.
judges: Brewster, Trott, Wardlaw